## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**JUSTIN J. McCRAE,**

      **Plaintiff,**

**vs.**                         **Case No.  1:17-cv-228-MW/CAS**

**NANCY A. BERRYHILL,**
**Deputy Commissioner for Operations,**
**Social Security Administration,**[1]

      **Defendant.**
_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned United

States Magistrate Judge for a report and recommendation pursuant to 28

U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court

pursuant to 42 U.S.C. § 405(g) for review of the final determination of the

Deputy Commissioner (Commissioner) of the Social Security

Administration (SSA) denying Plaintiff's Title XVI application for

Supplemental Security Income (SSI) benefits.  After careful consideration

---

[1] *See* <u>Hayes v. Berryhill</u>, No. 17-cv-00958-REB, 2018 U.S. Dist. LEXIS 79945, at *16 n.1 (D. Colo. May 11, 2018).

of the entire record, it is respectfully recommended that the decision of the

Commissioner be affirmed.

## I. Procedural History

This case has an extended procedural history pre-dating the

Administrative Law Judge's (ALJ) decision that is before the Court.  Tr. 72-

85.[2]  On December 26, 1995, an application for SSI payments was filed on

behalf of Plaintiff by his grandmother.  Tr. 72.  (Plaintiff was born in 1987.

Tr. 27, 73.)  Pursuant to Public Law 104-193, Plaintiff's case was re-

evaluated and new assessments of disability were performed in

accordance with the modified standards of disability.  *Id.*  It was determined

that Plaintiff no longer met the definition of disability effective June 1, 1997.

*Id.*  Plaintiff's grandmother requested reconsideration which was denied

and a request for hearing was filed.  *Id.*  After this hearing, the ALJ

determined Plaintiff was no longer disabled and Plaintiff's grandmother filed

an appeal with the Appeals Council.  *Id.*  On June 27, 2003, the Appeals

Council remanded the "case for further proceedings under the new and

material evidence provision of the Social Security Administration

regulations."  *Id.*  On November 1, 1999, a subsequent claim was filed

---

[2]  Citations to the record transcript/administrative record, ECF No.11, shall be by
the symbol Tr." followed by a page number that appears in the lower right corner.

which was granted by the state agency and it was determined that Plaintiff

("the child") became disabled on November 1, 1999.  *Id.*  (As of 1999,

Plaintiff was 11 years old.  Tr. 29.)  The Appeals Council affirmed the

finding by the state agency that Plaintiff became disabled on November 1,

1999.  Tr. 72.  On remand, the Appeals Council required the ALJ to give

further consideration to the treating and examining source medical

opinions, further evaluate Plaintiff's mental impairments and give further

consideration to Plaintiff's maximum residual functional capacity (RFC)

prior to November 1, 1999.  *Id.*  Plaintiff and his grandmother appeared and

testified at a subsequent hearing held on May 10, 2004, Gainesville,

Florida.  *Id.*  Plaintiff "was not represented despite the fact that [Plaintiff]

and his grandmother were fully apprised of their right to legal

representation."  Tr. 73.  ALJ John D. Thompson, Jr., entered a decision on

February 24, 2005, and determined that Plaintiff, as a child, was not eligible

for SSI payments from June 1, 1997, through October 31, 1999, his

eligibility for these benefits ended on August 31, 1997, and that "[h]e

became re-entitled to such disability benefits on November 1, 1999[,]

pursuant to a prior determination by the state agency."  Tr. 79.

It appears Plaintiff received SSI benefits until he was incarcerated on February 27, 2012. Tr. 23, 26, 375, 380. Plaintiff was released from incarceration on or about February 6, 2014. Tr. 380.

On February 7, 2014, Plaintiff filed an application for SSI alleging disability beginning February 7, 2014, based on bipolar, schizophrenia, and crack baby, slow learner. Tr. 17, 167-78, 216, 221, 248. Plaintiff's application was denied initially on June 10, 2014, and upon reconsideration on July 3, 2014. Tr. 17. On July 22, 2014, Plaintiff requested a hearing. *Id.* On May 10, 2016, Plaintiff appeared and testified at a video hearing conducted by ALJ Robert Droker with Plaintiff in Gainesville, Florida, and the ALJ presided over the hearing from Jacksonville, Florida. Tr. 17, 37-65. Martin Katz, an impartial vocational expert, testified during the hearing. Tr. 37, 61-65. Plaintiff was represented by Martin J. Goldberg, an attorney. Tr. 17, 37-39, 124-25.

On May 4, 2016, Plaintiff's counsel filed a brief. Tr. 275-76. On June 2, 2016, the ALJ issued a decision and denied Plaintiff's application for benefits, concluding that Plaintiff was not disabled since February 7, 2014, the date the application was filed. Tr. 17-31. On July 29, 2016, Plaintiff's representative requested the Appeals Council to review the ALJ's decision and filed an addendum to the request for review. Tr. 163-66, 287; *see*

Tr. 4.  On July 14, 2017, the Appeals Council denied Plaintiff's request for review.  Tr. 1-6.

On September 14, 2017, Plaintiff, by counsel, filed a Complaint seeking review of the ALJ's decision.  ECF No.1.  The parties filed memoranda of law, ECF Nos. 20-21, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant has not engaged in substantial gainful activity since February 7, 2014, the application date."  Tr. 19.

2. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD); borderline intellectual functioning, a personality disorder; and substance abuse.  *Id*.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id*.  The ALJ determined that the claimant did not meet the criteria under Listings 12.02, *12.05*, 12.08, and 12.09.  *Id*.  The ALJ determined that Plaintiff had *moderate* restriction in activities of daily living, in social functioning, and with regard to concentration, persistence, or pace, and experienced *no* episodes of decompensation, which have been of extended duration. Tr. 20.  Pertinent here, the ALJ considered the limitations identified in paragraphs A through D of Listing 12.05 and determined Plaintiff did not meet these requirements.  Tr. 21.

4. "[T]he claimant has the residual functional capacity [RFC] to perform medium work as defined in 20 CFR 416.967(c) except he needs to avoid ladders or unprotected heights; needs to avoid the operation of heavy, moving machinery; needs a low-stress work environment, meaning no production line; needs simple, repetitive tasks; and needs to avoid contact with the public or co-workers,

meaning he needs tasks that do not require the assistance of others or that require him to assist others with the performance of their tasks."  Tr. 21.

5. "The claimant is unable to perform any past relevant work," such as kitchen helper, medium exertion, with an SVP of 2.  Tr. 29; *see infra* at 6, n.3.

6. The claimant was 26 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  *Id*. The claimant has a limited education and is able to indicate an English.  Tr. 30.  Transferability of jobs is not an issue in this case because the claimant's past relevant work is unskilled.  *Id*.

7. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform such as hand packer and food cleaner, medium exertion, with an SVP of 2; and warehouse checker and labeler, light exertion, with an SVP of 2.[3]  Tr. 32.

8. "The claimant has not been under a disability, as defined in the Social Security Act, since February 7, 2014, the date the application was filed."  Tr. 31.

---

[3] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  A Specific Vocational Preparation (SVP) of 1 means "short demonstration only." Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id*.  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id*.  Unskilled work corresponds to an SVP of 1 and 2.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[4]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2)

---

[4] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 416.905(a), 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[5]

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the

---

[5]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor").  The Court will apply the SSR in effect when the ALJ rendered the decision.  *See generally* Bagliere v. Colvin, No. 1:16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g). An ALJ may make this determination either by applying the grids or by obtaining the testimony of a vocational expert. Phillips, 357 F.3d at 1239-40; *see* 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 416.912(a)(1); Moore, 405 F.3d at 1211.

## IV. Legal Analysis

### Substantial Evidence Supports the ALJ's Determination that Plaintiff's Impairments do not Meet or Equal the Criteria of Listing 12.05B or C.

#### A.

Plaintiff argues he is not disabled because his mental condition meets the criteria in Listing 12.05B and/or C in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  ECF No. 20 at 5-15.  The Listing of Impairments describes conditions that are so severe as to prevent a person from performing any gainful activity.  *See* 20 C.F.R. § 416.925(a); <u>Wilson</u>, 284 F.3d at 1224.  A claimant bears the burden of proving his impairments meet a Listing.  *See* <u>Barron v. Sullivan</u>, 924 F.2d 227, 229 (11th Cir. 1991).  "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement."  <u>Wilson</u>, 284 F.3d at 1224; *see* 20 C.F.R. § 416.925(c)(3).  The claimant has the burden of proving that his impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all the specified medical criteria.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).

Plaintiff alleges he is disabled because he has an "inability to work as of February 7, 2014, due to a bipolar disorder, schizophrenia, ADHD, and being a "crack baby, slow learner" (Exhibits B4E and B7E)."  Tr. 22.

### B.

Listing 12.05B and C provides:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied.

* * * *

B.  A valid verbal, performance, or full scale IQ of 59 or less; OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05B and C (emphasis added).[6]

---

[6] "Effective September 3, 2013, the Social Security Administration replaced the term *mental retardation* with the term *intellectual disability* as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,4501 [sic] (Aug.1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt P, app 1). This change was made because "the term 'mental retardation' "has negative connotations," and "has become offensive to many people. *Id.* at 46,499.  But this change "d[id] not affect the actual medical definition of the disorder or available programs or services." *Id.* at 49,500 [sic]. Frame v. Comm'r of Soc. Sec. Admin., 596 F. App'x 908, 910 n.2 (11th Cir. 2015) (unpublished).

The introductory material to the mental disorders listings clarifies

Listing 12.05 stating:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [SSA] will find that your impairment meets the listing.

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00A; *see also* 20 C.F.R.

§ 416.925(c)(3).

The diagnostic description in Listing 12.05 requires a showing of

deficits in adaptive functioning, not just IQ scores. Adaptive functioning

"'refers to how effectively individuals cope with common life demands and

how well they meet the standards of personal independence expected of

someone in their particular age group, sociological background, and

community setting.'" O'Neal v. Comm'r of Soc. Sec., 614 F. App'x 456, 459

(11th Cir. 2015) (unpublished) (quoting DSM-IV-TR at 42); *see infra* at 22

n.8.

Listing 12.05B has two elements. First, it requires one valid IQ score

of 59 or less.[7] 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05B. IQ scores

---

[7] When multiple IQ scores are derived from an IQ test, the lowest score, in conjunction with Listing 12.05, is considered. 20 C.F.R., pt. 404, subpt. P, app. 1,

obtained after age 22 raise a presumption that they are reflective of lifelong

intellectual functioning.  Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th

Cir. 2001).  Second, it requires deficits in adaptive functioning which initially

manifested before age 22.  20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05.

> To meet listing 12.05 ("intellectual disability"), "a claimant must
> at least (1) have significantly subaverage general intellectual
> functioning; (2) have deficits in adaptive behavior; and (3) have
> manifested deficits in adaptive behavior before age 22." Crayton, 120
> F.3d at 1219.  These requirements are referred to as the listing's
> "diagnostic criteria."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00
> ("Listing 12.05 contains an introductory paragraph with the diagnostic
> description for [intellectual disability].")  In addition to satisfying the
> diagnostic criteria, a claimant must meet one of the four severity
> requirements in paragraphs A through D of the listing.  See id.
> § 12.05.  Under paragraph C, the only paragraph at issue here, a
> claimant must show that she has both "[a] valid verbal, performance,
> or full scale IQ of 60 through 70 and a physical or other mental
> impairment imposing an additional and significant work-related
> limitation of function."

Frame v. Comm'r of Soc. Sec. Admin., 596 F. App'x at 910-11.

Generally, the claimant meets the criteria for presumptive disability

under Listing 12.05C when the claimant presents a valid IQ score of 60

through 70 inclusive *and* when the claimant presents evidence of an

additional mental or physical impairment significantly affecting claimant's

ability to work.  *See* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir.1992)

---

§ 12.00D.6.c. ("In cases where more than one IQ is customarily derived from the test
administered, e.g., where verbal, performance, and full-scale IQs are provided in the
Wechsler series, we use the lowest of these in conjunction with 12.05.").

(a valid IQ score need not be conclusive of mental retardation, where IQ score is inconsistent with other evidence in record concerning claimant's daily activities and behavior); Crayton v. Callahan, 120 F.3d 1217, 1219-20 (11th Cir. 1997).  "An ALJ should consider whether the results of an I.Q. test are consistent with the other medical evidence and the claimant's daily activities and behavior."  Henry v. Barnhart, 156 F. App'x 171, 173 (11th Cir. 2005) (unpublished) (citing Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986)).

In Hodges v. Barnhart, the court found that there was a presumption of deficits in adaptive functioning *prior* to age 22 if the claimant had a valid IQ score between 60 and 70.  276 F.3d at 1268-69 ("absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of fairly constant IQ throughout [the claimant's] life").  The court cautioned, however, that this presumption did not shift the burden of proof from the claimant to prove entitlement to benefits.  *Id.* at 1269. Moreover, the court explained that this presumption is rebuttable and the Commissioner may present evidence of the claimant's daily activities to rebut the presumption of mental retardation.  *Id.*  The Commissioner is not required to find "intellectual disability," formerly "mental retardation" based on IQ scores alone.  In Hodges, there was no evidence rebutting the

presumption that the plaintiff had mental retardation with deficits in adaptive

functioning.  276 F.3d at 1268.  The record was devoid of evidence related

to plaintiff's mental condition before age 22 and the record indicated that

the plaintiff could barely read from books and needed her daughter's

assistance to write letters.  *Id.*  The court remanded for the purpose of

examining plaintiff's activities of daily living to see if those activities rebutted

the presumption of mental impairment.  *Id.* at 1269.

Consistent with <u>Hodges</u>, "[i]f a claimant has been able to adapt in

functioning after age 22, it is permissible to find that Listing 12.05C has not

been met."  <u>Monroe v. Astrue</u>, 726 F. Supp. 2d 1349, 1355 (N.D. Fla.

2010).  The court in <u>Monroe</u> explains:

> In an unpublished case, the Eleventh Circuit has recast the rule of
> *Popp*: to meet Listing 12.05(C), "a claimant must at least (1) have
> significantly subaverage general intellectual functioning; (2) have
> [current] deficits in adaptive functioning; and (3) have manifested
> deficits in adaptive behavior before age 22."  *Pettus v. Astrue*, 226
> Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (not selected for
> publication in the Federal Reporter, No. 06-15667).  However, it has
> been pointed out that: "Listing 12.05 does not require *significant*
> deficits in adaptive functioning; it only requires that there be 'deficits
> in adaptive functioning initially manifested during the developmental
> period; i.e., . . . before age 22.'  20 C.F.R., Part 404, Subpart P,
> Appendix 1 § 12.05."  *Cammon v. Astrue*, 2009 U.S. Dist. LEXIS
> 92293, 2009 WL 3245458, *11 (N.D. Ga. Oct. 5, 2009) (No. CIV. A.
> 3:08-CV-0131-JFK).

*Id.* at 1355 n.5.  Further,

The caselaw addressing the "adaptive functioning" aspect of Listing 12.05C suggests that the adaptive functioning must be significantly inconsistent with the I.Q. score. An ability to do simple daily activities and simple jobs is not enough. As noted in *Lowery*, in *Popp* the court sustained the ALJ's rejection of a claim of equivalency to Listing 12.05C because the claimant's I.Q. score of 69 was "inconsistent with evidence that [the claimant] had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher." 979 F.2d at 837, citing *Popp*, 779 F.2d at 1499. Additionally, there was evidence in *Popp* that the claimant had "tended to place himself in a very unfavorable light," thereby rendering the personality test scores (the MMPI, not the I.Q. test) invalid in the opinion of the examiner. *Popp*, 779 F.2d at 1498-1499, 1500.

*Popp* is perhaps the strongest case for finding that an I.Q. score below 70 does not necessarily meet Listing 12.05C. There are several others with facts somewhat like *Popp*. *Bischoff v. Astrue*, 2008 U.S. Dist. LEXIS 79534, 2008 WL 4541118 (S.D. Fla. Oct. 9, 2008) (No. 07-60969-CIV), affirmed the determination that Listing 12.05C was not met. The court noted that while the claimant's I.Q. scores were lower than 70, the claimant had previously worked as a parts manager and as an automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years. *Id.*, at *20. There was also evidence that the claimant was "faking" his I.Q. score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training. *Id*.

*Id*. at 1355. As noted in <u>Monroe</u>, a different result was reached in

<u>Durham v. Apfel</u>, 34 F. Supp. 2d 1373 (N.D. Ga. 1998), where the court

held:

Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102). Mr. Durham has worked primarily as a

heavy laborer (TR 46).  There is no evidence that these jobs are beyond the reach of a mildly retarded individual.
34 F.Supp.2d at 1380.  Distinguishing *Popp*, the court said:

Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer.  He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46).  Mr. Durham did not go to college, he went to the fourth grade.  *Id.  See also Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability to identify and administer his medication; his previous jobs; his obtaining a GED" were not inconsistent with a finding of mental retardation and the I.Q. scores) (citing *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry, and clean his room.").

Monroe, 726 F. Supp. 2d at 1356-57; *see* Willis v. Astrue, No. 5:12cv64/RS/CJK, 2012 U.S. Dist. LEXIS 182201 (N.D. Fla. Nov. 26, 2012).

Although the ALJ is not required to accept the results of an IQ test as reported by an expert, "[t]he ALJ cannot act as both judge and physician." Durham v. Apfel, 34 F. Supp. 2d at 1380 (citing Marbury v. Sullivan, 957 F.2d 837, 840-41 (11th Cir. 1992)).  Put differently, substantial evidence must support the ALJ's discounting of an IQ score that is favorable to a claimant.

## C.

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the criteria of Listing 12.05B and C.  Tr. 19-21.  In making this determination, the ALJ considered the criteria of Listing 12.05B and C in conjunction with other medical evidence and Plaintiff's daily activities and behavior.  *Id.  See generally* Popp v. Heckler, 779 F.2d at 1500; Henderson v. Astrue, 401 F. App'x 449 (11th Cir. 2010) (unpublished).

The ALJ determined that Plaintiff did not meet the "paragraph B" criteria of Listing 12.05 because Plaintiff

> does not have a valid verbal, performance, or full scale IQ score of 59 or less.  Although the claimant's 2006 IQ testing rendered a Performance IQ score of 59, Dr. Benet stated that this score was not a valid indicator of the claimant's functioning based on his clinical presentation, which was indicative of borderline intellectual functioning (Exhibit B4F) [Tr. 304].

Tr. 21.  The ALJ also determined Plaintiff did not satisfy the "paragraph C" criteria

> because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Although the claimant's 2006 IQ testing rendered a Performance IQ score of 59, Verbal IQ score of 66, and a Full Scale IQ score of 61, Dr. Benet stated that the scores were not valid indicators of the claimant's functioning based on his clinical presentation, which was indicative of "high" borderline intellectual functioning (Exhibits B4F [Tr. 304] and B12F [Tr. 382]).  Furthermore,

> Dr. Harness found that the claimant's February 2012 BETA III IQ and WASI IQ scores of 70 were indicative of borderline intellectual functioning (Exhibit B11F) [Tr. 377].

*Id.*; *see* Tr. 22, 377.  (Dr. Harness also found Plaintiff's ABC score of 40 indicative of "adequate adaptive behavior functioning."  Tr. 377.)

Plaintiff did not meet his burden of proving that his impairment met Listing 12.05 because he did not show that his impairments met the diagnostic description in the introductory paragraph of Listing 12.05, specifically that he had deficits in adaptive functioning.  20 C.F.R., pt. 404, subpt. P, app. 1, §§ 12.05.  Plaintiff's activities, as discussed by the ALJ, do not indicate deficits in adaptive functioning.  Tr. 17-31.  Plaintiff admitted that he has no problem with self-care tasks, which he can perform independently.  He admitted performing a variety of activities, including helping with yard work conditions, making his bed, cooking, vacuuming, sweeping, mopping, and taking out trash, going to the grocery store, attending church, visiting friends, watching television, listening to music, and playing basketball, among other things.  *See, e.g.*, Tr. 26, 42-46, 51-52, 227-42.  When he was incarcerated, Plaintiff also performed job duties, specifically washing dishes, which he stopped because he "was tired of it" rather than any problem with performing the task.  Tr. 45, 51-52.  He also reported applying for a job in 2014, which is inconsistent with his

statements that he believes he is unable to work at any job.  Tr. 28, 41,

381.  Plaintiff's daily activities provide substantial evidence that he did not

have the requisite deficits in adaptive functioning.  *See* O'Neal v. Comm'r of

Soc. Sec., 614 F. App'x at 459.

Moreover, the medical sources who examined and treated Plaintiff

did not indicate that he had deficits in adaptive functioning.  Plaintiff's

Department of Corrections records from 2012 and 2013 indicate that his

mental status examinations were essentially normal, including normal

levels of anxiety, hostility, depression, and distractibility, despite the fact

that he was not taking any psychotropic medications at that time.  Tr. 22-

23, 27, 366-78.  Those medical examinations also revealed intact memory

and adequate insight and judgment.  Tr. 366-78.  Although Plaintiff had five

DR's during his incarceration, in December 2013, Dr. Kannikal noted that

only one of those events was in the past six months.  Tr. 373.  Dr. Kannikal

also noted that during his incarceration, Plaintiff's episodes of mood swings

had decreased from three to five episodes per month to zero episodes per

month.  Tr. 372-73.

After his alleged onset of disability in February 2014, Plaintiff was

seen by Dr. Benet for an evaluation on May 23, 2014, as noted by the ALJ.

Tr. 23, 379-83.  At that time, Plaintiff's grandmother reported that he was "doing well on medication, but without it, she said, 'He gets mad over anything, slamming doors, and foaming at the mouth like a mad dog.'" Tr. 380.  He no longer hears voices as in the past.  *Id.*  Although earlier IQ testing included scores that could indicate mild mental retardation, Dr. Benet noted that Plaintiff was more likely functioning in the borderline intellectual functioning range based on his clinical examination.  Tr. 381 ("General intellectual ability was estimated to be high borderline, with correspondingly limited judgment and insight."  *Id.*)  Further, Dr. Benet noted that Plaintiff's grandmother reported he arises early and often leaves the house to hang out with friends and he sometimes helps her clean around the house and attends church.  *Id.*  During this visit, Plaintiff also reported recently applying to work at McDonald's.  *Id.*  Dr. Benet described Plaintiff as quiet, but friendly and cooperative, with a pleasant mood.  *Id.*

The ALJ noted "Dr. Benet indicated that an updated psychiatric evaluation from Meridian Behavioral Health diagnosed the claimant with cannabis abuse and a bipolar disorder with a GAF score of 65."[8]  Tr. 23; *see* Tr. 380.  Dr. Benet gave Plaintiff a current GAF

---

[8]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to

score of 50 to 55, which is indicative of moderate to serious
symptoms.  Dr. Benet opined that the claimant would likely have
marked difficulties performing work-related tasks involving
understanding and memory, sustain concentration and persistence,
social interaction, and adaptation.  He recommended continued
treatment through Meridian for bipolar disorder and possible cannabis
and alcohol abuse, and he recommended an updated general
intellectual evaluation to rule out borderline intellectual functioning
versus mild mental retardation.

Tr. 383.  Ultimately, the ALJ gave "some weight" to Dr. Benet's GAF score

of 50 to 55, "but little weight to his opinion" noted above and explained:

this opinion is not supported by his own relatively benign examination
findings related to the claimant's bipolar disorder or by his findings
that the claimant had adequate attention and concentration with
borderline to fair recall (Exhibit B12F) [Tr. 381].  His opinion is also
not supported by the claimant's Department of Corrections records or

only psychological, social, and occupational functioning) and "may be particularly useful
in tracking the clinical progress of individuals in global terms, using a single measure."
See DSM-IV-TR.  The GAF scale is divided into 10 ranges of functioning, each with a
10-point range in the GAF scale.  Id.  See Nichols v. Astrue, Case No.
3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012)
(discussing GAF scale).  A GAF scale rating of 51-60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school functioning.  Id.  A GAF scale rating
of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or
school functioning, but generally functioning pretty well.  Id.  A GAF scale rating of 71-
80 indicates that if symptoms are present, they are transient and expectable reactions
to psycho-social stressors and no more than slight impairment in social, occupational, or
school functioning.  Id.  The "Commissioner has declined to endorse the GAF scale for
'use in the Social Security and SSI disability programs,' and has indicated that GAF
scores have no 'direct correlation to the severity requirements of the mental disorders
listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (unpublished)
(citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the
Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (2013), "[i]t was
recommended that the GAF be dropped from DSM-5 for several reasons, including its
conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its
descriptors) and questionable psychometrics in routine practice.  In order to provide a
global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is
included, for further study, in Section III of DSM-5 (see the chapter "Assessment
Measures")."  DSM-5 at 16.

> by his more recent treatment records from Meridian, which show
> improvement of his symptoms once he resumed taking medication
> (Exhibit B13F) [Tr. 389 (Mar. 28, 2016)].

Tr. 29; *see infra* at 26-30 for the context of the ALJ's conclusions.

Treatment records from Meridian Behavioral Health (Meridian) in

2015 to 2016 showed some problems with anger or aggression, but only

mild impairments in memory despite Plaintiff's borderline intellectual

functioning.  Tr. 385-93.  (The ALJ considered records from Meridian during

this time-span.  Tr. 24-25.)  The absence of intellectual, cognitive, or other

mental difficulties in the notes of these professionals provides further

evidence that Plaintiff did not have deficits in adaptive functioning.

The ALJ gave great weight to the evaluations of State agency

psychological consultants, Angeles Alvarez -Mullin, M.D. (June 4, 2014),

and Val Bee, Psy.D. (July 2, 2014),

> who found that the claimant has borderline intellectual functioning
> rather than an intellectual disability with no more than moderate
> limitations in functioning (Exhibits B3A and B6A).  Their opinions (that
> the claimant is capable of understanding and remembering simple
> instructions, probably best when spoken/demonstrated; has adequate
> attention and concentration to complete simple, routine tasks within
> appropriate periods of time; capable of maintaining routine work
> without special supervision; capable of completing a routine work
> schedule; needs limited social interaction; and is capable of adjusting
> to simple changes in his work routine, but might not like them) are
> supported by the objective evidence of record, the efficacy of the
> claimant's medication regimen, and his activities of daily living.

Tr. 29.[9]  Although both State agency consultants did not examine Plaintiff

or review the entire record,[10] the ALJ reviewed all the evidence, and the

opinions of both consultants are consistent with the record as a whole and

the provided explanations for their opinions.  Tr. 90-94, 103-09; *see* 20

C.F.R. § 416.927(c)(3), (c)(4).

In addition, Plaintiff did not prove his impairment satisfied the

diagnostic description in the introductory paragraph of Listing 12.05, which

alone is sufficient to conclude Plaintiff's impairments did not meet Listing

12.05.  *See* Zebley, 493 U.S. at 530; Wilson, 284 F.3d at 1224.  Plaintiff

also did not provide a valid IQ score to satisfy the criteria in subparagraph

B or C of Listing 12.05.  The record indicates Plaintiff received a

Performance IQ of 59 when tested in 2006.  Tr. 382.  As noted above,

---

[9] Although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a state agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review.  *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p eff. Mar. 27, 2017). The findings of a State agency medical consultant may provide additional evidence to support the ALJ's findings.  *See* Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986); *see also* 20 C.F.R. § 416.927(e)(2)(i).

[10]  Both consultants noted Dr. Benet's report of May 23, 2014, including a lack of validity of the 2006 IQ score as well as the diagnosis of borderline intellectual functioning (or even high borderline intellectual functioning to low average intellectual functioning), both finding that Plaintiff did not meet any Listing.  Tr. 87, 90-91, 101, 104-05.

Dr. Benet questioned, however, the validity of the scores and noted

Plaintiff's 2006 IQ test scores, including his Performance IQ score of 59,

were not a valid indicator of Plaintiff's ability to function based on his clinical

presentation, but rather was more indicative of borderline intellectual

functioning.  Tr. 22, 300-05, 381.  The evidence also shows that Plaintiff's

2012 IQ test scores of 70 were also indicative of borderline intellectual

functioning, Tr. 21, 374, 377, or possibly even low average intellectual

function.  Tr. 104.

Moreover, the other evidence in the record, as discussed above and

by the ALJ, indicates the IQ scores were not valid.  Plaintiff's activities of

daily living and the objective medical findings and treatment notes do not

indicate that the IQ scores accurately reflected Plaintiff's intellectual

functioning.  Thus, substantial evidence supports the conclusion that the IQ

scores were not valid.  Tr. 22-29; *see* Frame, 596 F. App'x at 913.

After discussing the medical and other evidence, including Plaintiff's

and his grandmother's hearing testimony, Tr. 22-28, the ALJ summarized

his findings supporting his RFC determination.  Tr. 27-29.

> The undersigned finds that the claimant's allegations of an inability to
> work as of February 7, 2014, due to his borderline intellectual
> functioning, ADHD, and personality disorder are not entirely
> consistent with the evidence of record.  The claimant's Department of
> Corrections records from 2012 and 2013 indicate that his mental
> status examinations were essentially normal, including normal levels

of hostility/irritability, depression, anxiety, and distractibility, despite the fact that he was not taking any psychotropic medications at that time (Exhibit B11F). Those mental status examinations also revealed intact memory and adequate insight and judgment (Exhibit B11F). Dr. Harness indicated that the claimant had an ABC score of 40, which indicated adequate adaptive behavior functioning (Exhibit B11F). Although the claimant had five DRs during his incarceration, in December 2013, Dr. Kannikal noted that only one of those was in the past six months and the claimant had no mental health emergencies or inpatient admissions within the past six months (Exhibit B11F). Dr. Kannikal further indicated that, during the claimant's incarceration, his episodes of mood swings had decreased from 3-5 episodes per month to 0 episodes per month, and his episode intensity level had decreased from a 6/10 on an increasing scale of 1-10 to a 0/10 (Exhibit B11F). The claimant's subsequent treatment records from Meridian in 2015 and 2016 also showed some problems with anger and aggression, but only mild impairments in memory despite his borderline intellect (Exhibit B13F). In addition, Dr. Benet described the claimant as quiet, but friendly and cooperative with a pleasant mood and "smiled often" (Exhibit B12F).

The undersigned notes that the claimant was not receiving treatment for his bipolar disorder and personality disorder for much of the period at issue; however, both he and his grandmother reported an improvement of his symptoms once he resumed taking medications in 2016 without causing side effects (Exhibit B13F and hearing testimony). Of note, the claimant did not fill this prescription when initially prescribed, and there is no evidence that he attended anger management therapy as recommended by his treating ARNPs at Meridian (Exhibit B13F). To the extent that the claimant alleges an inability to afford treatment or medications, the undersigned finds that there is no evidence that he sought out or was denied access to low-cost or no-cost medical care during this period. The efficacy of the claimant's treatment regimen when he takes his medication as prescribed is also supported by his grandmother's report to Dr. Benet that he did well when he was on his medications, but he became "mad over everything" when he was not (Exhibit B12F). The undersigned also notes that the claimant has been diagnosed with a cannabis-related disorder (Exhibit B13F) and tested positive for

opiates and TCH in November 2015 despite his denial of use of substances (Exhibit B13F).

The claimant's adaptive functioning is also not consistent with his allegations as he and his grandmother have reported that he engages in activities of daily living including listening to music, watching television, playing video games, cleaning his room, going outside daily, shopping in stores for snacks once a week, talking on the phone, performing personal care independently, washing dishes, helping his grandmother with the yard, cooking a little bit, making his bed, vacuuming, sweeping, mopping, taking out the trash, going out to eat twice a month, going to the grocery store once a month, going to church 2-3 times per month, visiting friends daily, and playing basketball (Exhibits B5E, B6E, B12F, B13F, and hearing testimony). He has also reported applying for jobs during the period at issue (Exhibit B12F), which is inconsistent with his statements that he believes he is unable to work at any job. The undersigned concludes that these activities and abilities are consistent with the determination that the claimant is able to perform tasks in a low- stress work environment, meaning no production line; needs simple, repetitive tasks; and needs to avoid contact with the public or co-workers, meaning he needs tasks that do not require the assistance of others or that require him to assist others with the performance of their tasks.

The undersigned gives some weight to the Third-Party Function Report of the claimant's grandmother, which describes some difficulty paying attention with the need for reminders to complete tasks as well as anger problems (Exhibit B5E); however, the undersigned concludes that these signs and symptoms are not consistent with an inability to perform all work and are adequately accounted for in the claimant's residual functional capacity.

With regard to the medical opinions of record, the undersigned gives some weight to the opinions of Dr. Harness and Dr. Kannikal, who assigned GAF scores of 65 (indicative of some mild symptoms) (Exhibit B11F); however, the undersigned finds that subsequent evidence shows that the claimant has moderate limitations due to problems controlling his anger as well as with maintaining attention and concentration.

The undersigned gives some weight to Dr. Benet's GAF score of 50-55 (indicative of moderate to serious symptoms), but little weight to his opinion that the claimant would likely have marked difficulty performing work-related tasks involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation (Exhibit B12F). This opinion is not supported by his own relatively benign examination findings related to the claimant's bipolar disorder or by his findings that the claimant had adequate attention and concentration with borderline to fair recall (Exhibit B12F). His opinion is also not supported by the claimant's Department of Corrections records or by his more recent treatment records from Meridian, which show improvement of his symptoms once he resumed taking medication (Exhibit B13F).

The undersigned gives great weight to the evaluations of the State agency psychological consultants (Angeles Alvarez-Mullin, M.D., and Val Bee, Psy.D.), who found that the claimant has borderline intellectual functioning rather than an intellectual disability with no more than moderate limitations in functioning (Exhibits B3A and B6A). Their opinions (that the claimant is capable of understanding and remembering simple instructions, probably best when spoken/demonstrated; has adequate attention and concentration to complete simple, routine tasks within appropriate periods of time; capable of maintaining routine work without special supervision; capable of completing a routine work schedule; needs limited social interaction; and is capable of adjusting to simple changes in his work routine, but might not like them) are supported by the objective evidence of record, the efficacy of the claimant's medication regimen, and his activities of daily living.

Although there is a history of low IQ scores, given the evaluations of Dr. Alvarez-Mullin and Dr. Bee as well as the conclusions of the consultative examiner, Dr. Benet, the undersigned finds the claimant is at borderline intellectual functioning rather than intellectual disability/mild mental retardation. The undersigned finds further that the impact of volitional factors rather than from

the claimant's medically determinable impairments is significant in this case.

Tr. 27-29.

The burden is on the claimant to prove that he is disabled.  Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  The third-step of the five-step process requires the ALJ to compare the claimant's medical evidence to a list of impairments "presumed severe enough to preclude any gainful work."  Sullivan v. Zebley, 493 U.S. at 525. If the medical evidence meets or equals the listing, then a finding of disability is made.  Id.  The claimant's impairments must meet or equal all the specified medical criteria in a particular listing for the claimant to be found disabled at step three of the sequential evaluation process.  Id. at 530-31.  Plaintiff did not meet his burden.  No error has been shown.

## V.  Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits should be **AFFIRMED** and Judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on June 13, 2018.

s/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  _See_ 11th Cir. R. 3-1; 28 U.S.C. § 636.**